**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

**CARVELL OLIVER,**

   **Plaintiff,**

**v.**                                                                 **CIVIL ACTION NO. 3:25-cv-03368-l**

**CLP CIRCULAR SERVICES, LLC,
BALCONES RECYCLING, LLC,
CLOSED LOOP PARTNERS, LLC,
Balcones Resources, Inc.**

<u>**EXHIBIT A PROPOSED SECOND AMENDED COMPLAINT**</u>

<u>**PROPOSED SECOND AMENDED COMPLAINT**</u>                                         1

## I. INTRODUCTION

1. Plaintiff Carvell Oliver ("Plaintiff") brings this action for race discrimination and retaliation arising from his employment as a General Manager in Dallas, Texas.

2. Plaintiff is African American and was the only African American General Manager employed by Defendants during the relevant period.

3. After Plaintiff received an "Exceeds Expectations" performance review December 2023, Plaintiff complained about race discrimination and retaliatory treatment. Following those complaints, Defendants increased scrutiny of Plaintiff's performance, placed him on a one-sided "Fresh Start Plan," and terminated him on October 28, 2024, while continuing the General Manager position and installing a non-African American replacement.

## II. PARTIES

4. Plaintiff Carvell Oliver is a resident of Dallas, Texas.

5. Defendant CLP Circular Services, LLC ("Circular Services") is a business entity that, at all relevant times, exercised operational and human-resources control over the business operations at issue in this case. Defendant Circular Services and related Balcones entities exercised operational and human-resources control over Plaintiff's employment.

6. Defendant Balcones Recycling, Inc. ("Balcones Recycling") is the entity listed as Plaintiff's employer on his W-2 forms for tax years 2022 and 2023, and as "Balcones Recycling" on his 2024 W-2. Balcones Recycling operates recycling facilities in Texas, including the facility where Plaintiff worked.

7. Defendant Closed Loop Partners, LLC ("Closed Loop Partners") is a business entity that, at all relevant times, exercised executive oversight and control over affiliated operations, including financial and accounting leadership that impacted Circular Services' operating companies.

8. Defendant Balcones Resources Inc. issued Plaintiff's offer letter and termination documentation.

9. Plaintiff's employment documents and communications referenced multiple entities within the Defendants' corporate structure, including Plaintiff's offer letter, payroll documentation, employment communications, and termination paperwork.

**PROPOSED SECOND AMENDED COMPLAINT**                                     2

10. At all relevant times, Defendants operated as an integrated enterprise and/or joint employers with respect to Plaintiff's employment, sharing common management, interrelated operations, centralized control of labor relations, and common ownership.

11. Defendants jointly exercised authority over the terms and conditions of Plaintiff's employment, including hiring, supervision, discipline, compensation administration, and termination.

## III. JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims arise under federal law, including Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981.

13. Venue is proper in this District under 28 U.S.C. § 1391 because the events giving rise to Plaintiff's claims occurred in Dallas, Texas, within the Northern District of Texas. IV. DEFENDANTS' INTEGRATED OPERATIONS AND CONTROL

14. At all relevant times, the operations involving Balcones Resources, Balcones Recycling, Circular Services, and Closed Loop Partners functioned with overlapping leadership and coordinated management affecting Plaintiff's employment. Any variation in corporate naming reflects Defendants' own use of multiple affiliated entities during the relevant period.

15. Plaintiff's employment communications and management direction involved Circular Services' leadership, including human resources and operational executives.

16. Plaintiff's termination decision and termination meeting involved Circular Services leadership, including Brent Hildebrandt (President of Circular Services) and Raquel Hoffstot (Vice President of Human Resources). Termination paperwork listed Balcones Resources. Inc.

17. During Spring 2024, Defendants transitioned payroll and paid-time-off administration to ADP. The ADP system was branded and administered under Circular Services, and Plaintiff accessed payroll records and PTO balances through that system.

18. During 2023, executives associated with Closed Loop Partners routinely visited Defendants' corporate offices and provided direction regarding corporate functions including IT operations, accounting and billing operations, and company standards and

**PROPOSED SECOND AMENDED COMPLAINT**                                   3

policies, including matters affecting Plaintiff's operational budget and profit-and-loss responsibilities as General Manager of the Dallas facility.

19. For example, during May 2023 Amy Wagner was publicly identified as Chief Financial Officer of Closed Loop Partners and exercised CFO-level authority affecting accounting and financial operations associated with the recycling businesses operated by Defendants.

20. During 2024, after the resignation of the prior CFO executive, accounting personnel, including Accounting Supervisor Monique McBride reported directly to Amy Wagner and received direction from her regarding hiring decisions and leadership within the accounting department.

21. Amy Wagner later became Chief Financial Officer of Circular Services in 2025, reflecting continuity of leadership and operational oversight across the affiliated entities involved in Plaintiff's employment.

## V. FACTUAL ALLEGATIONS

### A. Hiring, Role, and Performance

22. Plaintiff was hired into the General Manager role on October 21, 2022.

23. Plaintiff performed his duties successfully and received an "Exceeds Expectations" performance review in December 2023.

24. At all relevant times, Plaintiff was qualified for his General Manager position.

### B. Disparate Drug Testing and Escalating Scrutiny

25. Beginning in early 2023, Plaintiff was subjected to repeated drug testing and was the only General Manager in the organization required to submit to repeated urine testing.

26. Plaintiff was drug tested on January 4, 2023; February 22, 2023; June 14, 2023; and September 8, 2023, through a third-party testing facility.

27. The testing program was enforced against Plaintiff by Mike Melby, Plaintiff's then-direct manager and Vice President of Operations.

28. On June 28, 2023, Plaintiff complained to Mike Melby about discriminatory and unfair workplace treatment, including concerns about the drug testing.

29. On September 26, 2023, after Plaintiff complained about repeatedly submitting urine samples, Mike Melby stated on an audio recording that additional testing had been done on purpose.

30. On February 27, 2024, Mike Melby warned Plaintiff on an audio recording that Plaintiff would become a "target" of the executive leadership team for using his earned paid time off.

## C. Protected Complaints of Race Discrimination and Retaliation

31. On July 2, 2024, Plaintiff reported concerns about racial bias and race discrimination to Human Resources.

32. On July 23, 2024, Plaintiff emailed Ron Gonen Owner of Closed Loop Partners, LLC and stated, in substance, that he was writing to inform him about an ongoing investigation concerning allegations of racial discrimination and hostile workplace environment involving Plaintiff's direct manager, VP of Operations (Dallas) Mike Melby, and others.

33. After Plaintiff's discrimination complaints, Defendants did not conduct a neutral investigation; instead, Plaintiff was directed toward counsel and was subjected to heightened scrutiny.

## D. Fresh Start Plan and Retaliation Escalation

34. On August 30, 2024, Plaintiff was presented with a document titled "Fresh Start Plan" during a meeting attended by Brent Hildebrandt and Raquel Hoffstot, and Plaintiff was told to sign the document.

35. The "Fresh Start Plan" was not a standard plan used for other General Managers and was issued to Plaintiff after his discrimination complaints.

36. Immediately after the August 30, 2024 meeting, Plaintiff raised concerns in writing about why he was the only General Manager required to sign such a plan and stated, in substance, that he believed he was being retaliated against.

37. On or about October 10, 2024, Plaintiff again complained to Brent Hildebrandt and Raquel Hoffstot about retaliation and lack of support impacting his facility.

## E. Escalation to Ownership and Hostile HR Response

38. On October 11, 2024, Plaintiff raised concerns about lack of HR support in hiring.

**PROPOSED SECOND AMENDED COMPLAINT**                          5

39. On October 14, 2024, Plaintiff escalated concerns about lack of HR support and related issues to ownership/leadership, shortly before his termination.

40. On October 16, 2024, Vice President of Human Resources Raquel Hoffstot sent Plaintiff a hostile email shortly after Plaintiff's escalation to ownership/leadership.

**F. Replacement Planning and Termination**

41. According to documents produced by Defendants in their March 20, 2025 EEOC Position Statement, on October 7, 2024 - three weeks before Plaintiff's termination - Mike Melby requested that Vice President of Human Resources Raquel Hoffstot prepare an offer letter for Jill McCagg with an effective date of November 1, 2024, to assume a General Manager position after Plaintiff's termination on October 28, 2024.

42. Plaintiff was terminated on October 28, 2024.

43. Plaintiff was informed in the termination meeting by Brent Hildebrandt (speaking the decision) with Raquel Hoffstot present, including in-person participation by Raquel and remote participation by Brent via Microsoft Teams.

44. Defendants stated that Plaintiff's role was being eliminated as "redundant" and/or as part of "restructuring."

45. In Plaintiff's separation paperwork, Defendants stated that Plaintiff was not being let go because of performance.

46. After Plaintiff's termination, Defendants continued the General Manager position and installed Jill McCagg, a white employee, into the General Manager role previously held by Plaintiff.

47. According to documents produced by Defendants in their March 20, 2025 EEOC Position Statement, Mike Melby requested that Vice President of Human Resources Raquel Hoffstot, copying Brent Hildebrandt, approve a base salary for Jill McCagg that exceeded Plaintiff's base salary at the time of Plaintiff's termination as General Manager.

48. Jill McCagg reported directly to Mike Melby, who had been Plaintiff's direct manager and was the subject of Plaintiff's earlier discrimination and retaliation complaints.

49. Defendants stated that Plaintiff's role was "redundant" or part of restructuring. The General Manager role nevertheless continued after Plaintiff's termination, and

<u>**PROPOSED SECOND AMENDED COMPLAINT**</u>                                    6

Defendants backfilled other operational roles, including the dispatcher position within days.

50. Within approximately three months of Plaintiff's termination, Jill McCagg resigned; she later served as a consultant, and Defendants hired additional General Manager leadership thereafter (including another General Manager in or around April 2025).

**G. EEOC Charge and Right to Sue**

51. Plaintiff filed a Charge of Discrimination with the EEOC on December 31, 2024.

52. Plaintiff received a Notice of Right to Sue dated September 9, 2025.

53. Defendants were aware of the EEOC proceedings, participated in responding, and submitted a position statement denying discrimination and retaliation.

**VI. CAUSES OF ACTION**

**COUNT I: Race Discrimination in Violation of Title VII (Against All Defendants)**

54. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

55. Title VII prohibits discrimination in employment on the basis of race with respect to compensation, terms, conditions, and privileges of employment.

56. Plaintiff is African American and was qualified for his General Manager position.

57. Plaintiff suffered an adverse employment action when Defendants terminated his employment on October 28, 2024.

58. Plaintiff was the only African American General Manager employed by Defendants, while several white and similar situated individuals held General Manager roles - After terminating Plaintiff, Defendants continued the General Manager role and installed Jill McCagg, a white employee, into the position previously held by Plaintiff.

59. The surrounding circumstances - including disparate drug testing, replacement planning before termination, and the proximity to Plaintiff's protected complaints - support a plausible inference that race was a motivating factor in Defendants' actions.

60. As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff has suffered and continues to suffer damages including lost wages, lost benefits, emotional distress, humiliation, and reputational harm.

**PROPOSED SECOND AMENDED COMPLAINT**                    7

**COUNT II: Retaliation in Violation of Title VII (Against All Defendants)**

61. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

62. Title VII prohibits retaliation against an employee because the employee opposed unlawful employment practices or made complaints of discrimination.

63. Plaintiff engaged in protected activity by complaining internally about race discrimination and unfair treatment, including complaints to Human Resources and leadership, and by escalating concerns to ownership executive team.

64. Defendants, including the management and human resources personnel involved in the relevant decisions, were aware of Plaintiff's complaints.

65. After Plaintiff engaged in protected activity, Defendants subjected Plaintiff to adverse actions, including the Fresh Start Plan and termination.

66. The timing and sequence of events—Fresh Start Plan after complaints, hostile HR response after escalation, and termination shortly thereafter—support a plausible inference of retaliation.

67. As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff has suffered and continues to suffer damages including lost wages, lost benefits, emotional distress, humiliation, and reputational harm.

**COUNT III: Race Discrimination in Violation of 42 U.S.C. § 1981 (Against All Defendants)**

68. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

69. 42 U.S.C. § 1981 guarantees all persons the same right to make and enforce contracts, including employment contracts, regardless of race.

70. Plaintiff had an employment relationship with Defendants contractual in nature.

71. Defendants discriminated against Plaintiff on the basis of race in the terms and conditions of employment and by terminating Plaintiff.

72. The facts alleged—including Plaintiff's status as the only African American General Manager, disparate drug testing, and replacement by a non-African American employee—support a plausible inference of race discrimination.

**PROPOSED SECOND AMENDED COMPLAINT**                    8

73. Defendants' conduct interfered with Plaintiff's right to make and enforce his employment relationship on equal terms.

74. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages including lost wages, lost benefits, emotional distress, humiliation, and reputational harm.

**COUNT IV: Retaliation in Violation of 42 U.S.C. § 1981 (Against All Defendants)**

75. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

76. Plaintiff engaged in protected activity by opposing race discrimination and complaining about discriminatory and retaliatory treatment.

77. Defendants were aware of Plaintiff's complaints.

78. Defendants retaliated against Plaintiff for asserting his rights by escalating scrutiny, issuing the Fresh Start Plan, and terminating his employment.

79. The close temporal proximity and sequence of adverse actions following Plaintiff's complaints support a plausible inference of retaliation.

80. As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff has suffered damages including lost wages, lost benefits, emotional distress, humiliation, and reputational harm.

**VII. PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and grant the following relief:

• Back pay in an amount to be determined, including lost wages and benefits;

• Front pay in an amount to be determined;

• Compensatory damages for emotional distress, humiliation, and reputational harm;

• Punitive damages to the extent permitted by law;

• Pre-judgment and post-judgment interest as allowed by law;

• Reasonable attorneys' fees and costs as permitted by law;

• Appropriate equitable and injunctive relief to prevent further discriminatory and retaliatory practices

• Removal of false HR allegations from records; and

• Such other and further relief as the Court deems just and proper.

## VIII. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## IX. SIGNATURE

Respectfully submitted,


/s/ Carvell Oliver
Plaintiff, Pro Se
Carvell Oliver
400 N Ervay St. Unit 130831
Dallas, Texas 75313
Email: coliver1773@outlook.com
Phone: 773-580-6172

**PROPOSED SECOND AMENDED COMPLAINT**                    10